IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:19-CR-151-TAV-DCP-2 |
| | ) | |
| USHERY M. STEWART, | ) | |
| | ) | |
| Defendant., | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate.

Now before the Court is Defendant's Motion to Suppress and for a *Franks* Hearing [Doc. 191], filed on September 18, 2020. The Government responded to Defendant's motion on October 2, 2020 [Doc. 231 at 31–46], and Defendant filed a Reply [Doc. 245] on October 9, 2020. The Court held a motion hearing on November 20, 2020. [Doc. 293]. Assistant United States Attorney David Lewen appeared on behalf of the Government, while Attorney John Barnes appeared on behalf of Defendant, who was also present.

Accordingly, for the reasons detailed below, after reviewing the parties' briefs and the relevant legal authorities, the Court recommends that Defendant's Motion to Suppress and for a *Franks* Hearing [Doc. 191] be denied.

I.      **BACKGROUND**

Defendant Ushery Stewart is charged [Doc. 243] in the Second Superseding Indictment with the conspiracy to possess and distribute Schedule I, II, III, and IV controlled substances, including 50 grams or more of methamphetamine, as well as a quantity of fentanyl, oxycodone,

alprazolam, marijuana, buprenorphine, and heroin, in violation of 21 U.S.C. § 846; aiding and abetting the possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (2); money laundering, in violation of 18 U.S.C. § 1956(h); and aiding and abetting to possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and 18 U.S.C. § 2.

The initial Indictment [Doc. 3] was returned by the grand jury on September 4, 2019 against Defendant Stewart and several other codefendants. A search warrant was also obtained for Defendant Stewart's alleged residence—301 Lippencott Street, Apartment 512, Knoxville, Tennessee ("301 Lippencott")—by law enforcement on September 4, 2019 and included the affidavit of Federal Bureau of Investigation Task Force Officer Brandon Stryker ("the Affidavit"). *See* [Doc. 191-1]. Law enforcement executed the search warrant on September 5, 2019 and found a Kel-Tec .9 mm rifle with a loaded magazine, multiple cell phones, a scale and grinder with possible drug residue, prescription pills for another individual, assorted ammunition, and $554 in U.S. currency. *See* [Docs. 191-2 & 191-3].

## II. POSITIONS OF THE PARTIES

Defendant now moves [Doc. 191] for a *Franks* hearing to challenge the veracity of the statements in the application for the search warrant, and to ultimately suppress all evidence seized during the search of 301 Lippencott. Additionally, Defendant seeks for the Court to find that the search warrant for 301 Lippencott was not supported by probable cause because it failed to establish a sufficient nexus between the place to be searched and the evidence sought.

First, Defendant asserts that he has made the requisite showing for a *Franks* hearing, as Paragraph 13 of the Affidavit is based entirely upon a falsehood, made deliberately or with reckless

2

disregard for the truth. [*Id.* at 3–5]. Defendant also claims that Paragraphs 9 and 15 also contain a falsehood, made deliberately or with reckless disregard for the truth. [*Id.* at 5–6].

Next, Defendant claims that the Affidavit did not establish a nexus between his residence at 301 Lippencott and the items to be seized in the search warrant, as the Affidavit failed to mention Defendant's residence except for the statement that drug dealers usually keep controlled substances, historical documents and records, and related items at their residence. [*Id.* at 7–9].

The Government responds [Doc. 231] first by providing the background of law enforcement's multi-month Title III wiretap investigation into a particular local set of Vice Lords, of which it alleges Defendant is a member, engaging in repeated and extensive drug trafficking from June through August 2019. Additionally, the Government details law enforcement's interception of wiretap calls between Defendant and Codefendant Gilmore on August 2, 2019, law enforcement's surveillance of their subsequent meeting, and the application for and execution of the search warrant at issue. [*Id.* at 31–32].

The Government concedes that Defendant has identified several inaccuracies in the challenged paragraphs but claims that these mistakes are "immaterial" and not required for a finding of probable cause. [*Id.* at 34]. The Government asserts that Defendant has not made the required showing for a *Franks* hearing, as well as that he has not included sufficient support for his allegations that Officer Stryker acted knowingly or recklessly. [*Id.* at 39].

The Government then claims that the Affidavit established a sufficient nexus to demonstrate the likelihood that evidence of drug trafficking would be found at Defendant's residence, claiming that the Affidavit "demonstrated that Defendant Stewart was actively and repeatedly involved in acquiring, attempting to acquire, and selling large quantities of drugs, including pounds of methamphetamine." [*Id.* at 42–43]. Defendant replies [Doc. 480] that the

falsehoods contained in the Affidavit were not mere inaccuracies and includes specific arguments with respect to the challenged paragraphs.

## III.     REQUEST FOR A *FRANKS* HEARING

### A.     Legal Standard

"In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement." *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "A defendant challenging the validity of a search warrant's affidavit bears a heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). "[O]f course, a presumption of validity [exists] with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. To be entitled to a *Franks* hearing, "a defendant must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Crawford*, 943 F.3d at 309 (quoting *Franks*, 438 U.S. at 171). "'The allegedly false statement,' moreover, must be 'necessary to the finding of probable cause.'" *Id.*

In *Crawford,* the Sixth Circuit detailed the "two questions of fact, and one of law," upon which "[a] *Franks* analysis turns:"

> The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant?

*Id.*

The Sixth Circuit has also extensively detailed the necessary culpability of an affiant required to warrant a *Franks* hearing, stating:

4

The bottom line [in *Franks* was] that an evidentiary hearing on the affidavit's truthfulness was required *only* if the defendant alleged "deliberate falsehood or . . . reckless disregard for the truth." [*Franks*, 438 U.S. at 171]. "Allegations of negligence or innocent mistake," the Court emphasized, would be "insufficient." *Id.* And the allegations of deliberate or reckless falsehood "must be accompanied by an offer of proof." *Id.* Even having satisfied these steps, a defendant must still show that "when material that is the subject of the alleged falsity or reckless disregard is set to one side," the affidavit's remainder no longer demonstrates probable cause. *Id.* at 171–72. Only then is a defendant entitled to a *Franks* hearing to prove his allegations. *Id.* at 172. *Franks* thus drew an evidentiary line with reference to the well-known common-law scienter standards: negligence, recklessness, and willfulness. *See* Restatement (Second) of Torts §§ 8A, 282, 500 (1965). Only "substantial" evidence tending to show one of the two more culpable mental states, *Franks* said, would do.

*Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). An officer's statement is only considered to be issued with "reckless disregard for the truth" if the defendant shows the affiant subjectively entertained "serious doubts as to the truth" of his allegations. *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). "Allegations of [an officer's] negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

To demonstrate entitlement to a *Franks* hearing, Defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false." *Id.* at 170; *see United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) ("[T]his court's well-settled framework for *Franks* hearings requires a defendant to 'point to specific false statements.'") (quoting *United States v. Cummins*, 912 F.2d 98, 103 (6th Cir. 1990)). Defendant has specifically identified Paragraphs 9, 13, and 15 as the allegedly false statements in the Affidavit.

### B.    Paragraph 9

Paragraph 9 of the Affidavit states:

On June 5, 2019, Chief United States District Court Judge Pamela Reeves, of the Eastern District of Tennessee, authorized the wire and electronic interception of TARGET TELEPHONE 2 ("TT2") bearing the number 423-295-5574, believed to be used by [Codefendant Alim] TURNER. Interception began on June 6, 2019, and continued through July 5, 2019. As noted below, the interception of TT2

5

demonstrated that TURNER, among others, was purchasing and then reselling illegal narcotics with [Defendant] USHERY, and others.

[Doc. 191-1 at ¶ 9]. Defendant challenges Paragraph 9 of the Affidavit, which states that a wiretap was authorized and executed on TT2, 423-295-5574—a number believed to be used by Codefendant Alim Turner. Defendant claims, however, that while this number is associated with his (Ushery Stewart's) telephone, a court order has not been provided establishing that this phone was tapped, and thus "[e]ach time the affiant cites to an alleged conversation over TT-2, that citation refers back to the 423 number ascribed to TT-2 in paragraph 9 and is therefore necessarily false." [Doc. 191 at 5]. Therefore, Defendant alleges that the false statements in Paragraphs 12, 13, and 14 (referencing the use of TT2) should also be stricken from the record for the probable cause determination.

The Government responds that Paragraph 9, "which generally describes the federal wiretap authorizations, *incorrectly* lists TT2's phone number as '423-295-5574,' when it should have been '865-455-0315.'" [Doc. 231 at 34].[1] However, the Government asserts that while the 423 number listed for TT2 in Paragraph 9 is inaccurate, it did not need to be included in the Affidavit because it was immaterial to a finding of probable cause. The Government maintains that the reviewing judge was alerted that the investigation into Defendant and other conspirators included "lawful intercepts of wire and electronic communications." [*Id.* at 35]; *see* [Doc. 191-1 at ¶ 7].

Defendant replies [Doc. 245] that this error was not a mere inaccuracy, as when Officer Stryker stated that he tapped the 423 number, which is associated with Defendant, and detailed that certain conversations took place on that number, his statement was reckless. Defendant asserts that this statement is reckless "when viewed in light of the several other assertions made that were

---

[1] The Government also notes that Defendant's brief lists the TT2 phone number in the Affidavit as 423-395-5574. [Doc. 231 n.5]. The Court will hereafter refer to 423-295-5574 as "the 423 number."

6

not true." [*Id.* at 4]. Defendant maintains that "[w]hile the number itself may not have had to have been included, once it was, it was an assertion that needed to be true and accurate." [*Id.* at 5].

### C. Paragraph 13

Paragraph 13 of the Affidavit states:

> In July of 2019, law enforcement intercepted conversations over TT2 and TT3 in which [Codefendant Alim] TURNER and USHERY [Defendant] discussed plans to have pounds of meth shipped to addresses in the Eastern District of Tennessee. On July 13, 2019 law enforcement intercepted and later searched, pursuant to a search warrant, a package shipped to "Joe Stewart," at a local address. Postal records indicated that no such person, with USHERY's last name, lived at the address. Inside the package, law enforcement found approximately 5 pounds of meth. TT3, subscribed to by TURNER, and used by TURNER, called the United States Postal Service package tracking system in order to track the package that contained approximately 5 pounds of meth.

[Doc. 191-1 at ¶ 13]. Defendant asserts that this paragraph is based entirely on a falsehood and made deliberately or with reckless disregard for the truth, as it is contradicted by a review of the provided linesheets, which establish that the alleged conversation did not occur. Defendant claims that Officer Stryker sought to establish Defendant as complicit in a scheme to deal large quantities of drugs with Codefendant Alim Turner in order to tie his address to the overall conspiracy. Moreover, Defendant details that the surrounding paragraphs in the Affidavit (Paragraphs 11-12 and 14-15), with the exception of Paragraph 13, list the specific date, time, and quotes from an intercepted call.

The Government concedes that Defendant's conversation with Codefendant Alim Turner about receiving "pounds of meth shipped" to Knoxville did not occur in July of 2019, but maintains that the call occurred on June 30, 2019 at 7:30 p.m. [Doc. 231 at 35]. The Government also includes a transcript of the approximately two-minute phone conversation [Doc. 231-7] between Codefendant Alim Turner utilizing TT2 and Defendant discussing pounds of methamphetamine. Therefore, the Government maintains that Officer Stryker was referring to the June 30, 2019 phone

call in Paragraph 13 of the Affidavit, and his statement that the phone call occurred in July of 2019 is at most a minor inconsistency, and thus insufficient to meet the requirements necessary for a *Franks* hearing.

Defendant replies [Doc. 245] that "the question remains why the alleged 'pounds of meth' conversation was the only one in the several paragraphs that made a general conclusory statement as to what and when was said, rather than following the pattern used in the preceding paragraphs of stating the time and date of the call, transcribing the call, and 'translating' the meaning of the things said." [*Id.* at 5]. Therefore, Defendant asserts that the Court "can conclude that the[se] deviations require a hearing to determine whether there was an intent to mislead or a reckless disregard for the truth." [*Id.*].

### D.       Paragraph 15

Paragraph 15 of the Affidavit states:

One the same day [August 1, 2019] at 2:36 p.m., [Codefendant] Gilmore, utilizing TT3, called [Defendant] USHERY back and told USHERY, "All BP owe him is fourteen one thirty. USHERY responded, "Oh, alright." Gilmore stated, "But look, we got, we got, we got what we got and then what you said you should have will be exactly." USHERY responded, "We should have that by the end of the tonight." Gilmore stated, "Right. So, I told him, I told him what we, what we had and shit he was like all he owe him is fourteen one thirty. He said, so he said by the end of tonight or in the morning whenever we get it, or whenever we got the full amount, call us." USHERY responded, "We need to be headed towards Nashville." On 08/02/2019, Gilmore and USHERY communicated several times coordinating a meet at the TA Travel Center, 615 N Watt Rd., Lenoir City, Tennessee. Surveillance units observed USHERY deliver a bag of dog food to Gilmore at the TA Travel Center, then Gilmore, along with [Codefendant] Jyshon Forbes, traveled west on Interstate 40 towards Nashville. A Tennessee Highway Patrol marked unit conducted a traffic stop of Forbes and Gilmore's vehicle where they located $13,130 concealed inside a bag of dog food. Based on my training and experience, as well as the context in this investigation, I believe that the $13,130 was headed to Nashville as payment for the meth that was being shipped to TURNER, USHERY, and others in the DTO here in the Eastern District of Tennessee.

[Doc. 191-1 at ¶ 15].  Defendant claims that Paragraph 15 contains a falsehood made deliberately or with reckless disregard for the truth, as the assertion that he delivered the dog food bag and alleged drug money is repudiated by the FBI's 302 Report from the day in question.  *See* [Doc. 191-6].

The FBI's 302 Report states that Title III wire intercepts on August 1, 2019 provided that members of the Knoxville Ghost Recon Vice Lord Gang were attempting to make arrangements to provide a payment to their source of supply in Nashville, and details law enforcement's surveillance of Defendant and Codefendant Gilmore.  [*Id.*].  Specifically, the 302 Report states that Defendant "exited a silver BMW SUV and entered the silver Honda sedan [occupied by two black males, including Codefendant Gilmore], then returned to the silver BMW SUV."  [*Id.*].  Defendant asserts that the 302 Report makes no mention of Defendant possessing or transferring the bag of dog food, and points to the affidavit of defense counsel providing Defendant's expected testimony that he did not possess or deliver the dog food bag.  *See* [Doc. 191-7].  Additionally, Defendant maintains that "[f]urther photographs show the dog food bag to have been found in the front passenger seat of the Silver Honda, which was occupied by two passengers which calls into doubt the account that [Defendant] delivered the bag, given that the two passengers most likely would have been in the front two seats."  [Doc. 191 at 6].

The Government concedes that "although paragraph 15 demonstrates Defendants Stewart and Gilmore conspiring to both gather methamphetamine money in order to obtain more methamphetamine in Nashville, it was Defendant Gilmore – not Defendant Stewart – who procured the dog food bag in which to secrete the . . . money so it could be used to pay the Mexican source of supply."  [Doc. 231 at 38].  However, the Government asserts that it was immaterial to a finding of probable cause who procured the dog food bag; rather, the Government maintains that

9

the incriminating conversations between Defendant Stewart and Codefendant Gilmore and subsequent seizure of $13,130 by the Tennessee Highway Patrol were the essential details for a probable cause finding.

### E. Analysis

Ultimately, the Government has conceded that Paragraph 9 incorrectly lists TT2's phone number as the 423 number; that Paragraph 13 incorrectly states that the conversation at issue between Codefendant Alim Turner and Defendant occurred in July of 2019, instead of on June 30, 2019; and that Paragraph 15 incorrectly states that surveillance units observed Defendant deliver a dog food bag to Codefendant Gilmore at the TA Travel Center, when Defendant Gilmore actually had the dog food bag in which the money was hidden.[2] However, the Government classifies these statements as "immaterial inaccuracies" that were not necessary for a finding of probable cause. [*Id.* at 34].

Additionally, the Government asserts Defendant has not met his heavy burden to obtain a *Franks* hearing and addresses the submitted Affidavit of Counsel [Doc. 191-7]. The Government contends that there is no need for Defendant to testify because of their concessions, as well as "the immateriality of who introduced the bag of dog food to the scheme." [Doc. 231 at 9]. The Government also contends that Defendant failed to introduce any information about Officer Stryker's statement included in Paragraph 15.

First, the Court finds that the inaccuracy in Paragraph 9 with respect to the telephone number for TT2 was at most an "unimportant allegation" in the Affidavit. *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000); *see, e.g.*, *United States v. Brown*, 732 F.3d 569, 575

---

[2] The Government also notes that, although not raised by Defendant, the Affidavit incorrectly lists in Paragraph 8 the date of the Indictment as August 4, 2019, when it should have been listed as September 4, 2019.

10

(6th Cir. 2013) ("At most, the informant's statement about Frederick saying that he 'must have typed it up wrong' merely shows that Frederick was negligent in including the informant's statement that Williams was present when the drugs were in view.").

While Defendant claims that this alleged error was not a typographical error, and that TT2 is referenced throughout the Affidavit, the Affidavit does not connect the 423 number to Defendant. In fact, while the Affidavit states that a wire and electronic interception of TT2, bearing the 423 number was authorized, it is immediately followed by the statement that TT2 was "believed to be used by [Codefendant Alim] [TURNER]." [Doc. 191-1 at ¶ 9]. Later in the Affidavit, Officer Stryker specifically identifies TT2 as "used by [Codefendant Alim] TURNER." [*Id.* at ¶¶ 11–12]. Moreover, throughout the Affidavit when intercepted phone conversations are discussed, the Affidavit details the specific individuals involved in the conversation, including Defendant. *See* [*id.* at ¶¶ 11–13]. Accordingly, the incorrectly detailed telephone number is merely an allegation of negligence, which the Supreme Court found insufficient in *Franks. See Franks v. Delaware*, 438 U.S. 154, 171 (1978). Therefore, the Court finds that Defendant's arguments with respect to the 423 number do not establish the necessity for a *Franks* hearing. *See Swanson*, 210 F.3d at 791 ("[A] little negligence-actually even a lot of negligence-does not the need for a *Franks* hearing make."), *cited with approval in, United States v. Booker*, No. 3:18-CR-250, 2020 WL 2733727, at *5 (M.D. Tenn. May 26, 2020).

Defendant then argues that, regardless of the Government's concession regarding the date of the call in Paragraph 13, the discrepancies in format between this paragraph and the surrounding ones indicates that the affiant recklessly misled the issuing judge. Additionally, Defendant asserts that Paragraph 13 is necessary for a finding of probable cause, as the affiant felt it necessary to connect the purchase of five pounds of methamphetamine to Defendant. Defendant maintains that

11

the intercepted conversation between Defendant and Codefendant Alim Turner was extremely vague, with Codefendant Alim Turner telling Defendant about the package, whereas the Affidavit indicates that it was also Defendant's plan.

However, the Court does not find that the incorrect date or alleged inaccuracies in Paragraph 13 amount to Officer Stryker being untruthful under the standard set forth in *Franks* or made with a reckless disregard for the truth. "The Fourth Amendment demands a truthful showing sufficient to compromise probable cause." *United States v. Bradley*, No. 5:18-CR-26-TBR, 2019 WL 4017246, at *6 (W.D. Ky. Aug. 26, 2019). In *Franks*, the Supreme Court explained,

> This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may founded upon hearsay and upon information received from informants, as well as upon information in the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks*, 438 U.S. at 165.

Here, the Court does not find that the incorrect date of the telephone conversation between Defendant and Codefendant Alim Turner detailed in Paragraph 13 (June 30, 2019 versus sometime in July of 2019) is sufficient to warrant a *Franks* hearing. Defendant has not detailed how the difference in the specific date at issue alters the Court's probable cause analysis, particularly due to the fact that the call occurred on June 30, 2019—the day just prior to the beginning of July 2019. Again, this difference in the date in the Affidavit is at most the result of "negligence or innocent mistake." *Franks*, 438 U.S. at 171; *see, e.g.*, *Bradley*, 2019 WL 4017246 at *6 ("Finally, the Defendants argue that the information underlying the affidavit was not credible because the Defendants never actually traveled to Louisville and because it was more than a day or two when they traveled to Shepherdsville. But these inaccuracies do not amount to being 'untruthful' under the standard of *Franks*.").

Moreover, Defendant's arguments about the irregularity in the format of Paragraph 13 and the surrounding paragraphs are negated by the substance of the conversation between Defendant and Codefendant Turner. Defendant's assertion that "the question remains why the alleged 'pounds of meth' conversation was the only one in the several paragraphs that made a general conclusory statement . . . rather than following the pattern used in the preceding paragraphs" constitutes mere conclusory allegations. [Doc. 245 at 5]; see *United States v. Newman*, No. 3:19-CR-59-TAV-DCP, 2020 WL 6938815, at *3 (E.D. Tenn. Nov. 25, 2020) ("Mere conclusory allegations are insufficient, as are '[a]llegations of negligence or innocent mistake.'") (quoting *Franks*, 438 U.S. at 171).

While Defendant challenges the characterization of the conversation, this call did occur on June 30, 2019, and the Government has detailed how Defendant and Codefendant Alim Turner discussed the purchase and transportation of five pounds of methamphetamine. *See* [Doc. 231 at 36]. In particular, the Government details how Codefendant Alim Turner asked Defendant whether Codefendant Hounschell said that if he (Codefendant Alim Turner) got pounds of methamphetamine to an address, whether Codefendant Hounschell was going to "go cop 'em," to which Defendant responded "[t]hat's a given . . . like, that's, of course." [*Id.*]. After Codefendant Alim Turner responded that he had to have five pounds of methamphetamine "gone in a week," and asked Defendant "so you sure we can do that though," Defendant responded "Yeah, as soon as he got a good spot to send 'em." [*Id.*]. Ultimately, due to the nature of the conversation between Defendant and Codefendant Alim Turner, and the fact that the conversation occurred on June 30, 2019, the alleged failure to follow the pattern of describing intercepted phone conversations does not rise to the sufficient level of culpability necessary for a *Franks* hearing.

13

With respect to Paragraph 15, the Government concedes that the FBI's 302 Report did not mention Defendant transferring the dog food bag. However, the 302 Report also reviews the Title III wire intercepts describing Defendant and Codefendant Gilmore "attempting to make arrangements to provide a payment to their drug source of supply," with Codefendant Gilmore meeting Defendant "to obtain money that Gilmore would be driving to Nashville, Tennessee to pay the drug source of supply." [Doc. 191-6]. These intercepted conversations, as well as the meeting between Defendant and Codefendant Gilmore at the TA Travel Center and the subsequent seizure of $13,130 concealed inside a bag of dog food in Codefendant Gilmore's vehicle, are described in Paragraph 15 of the Affidavit. Therefore, even if the Court were to consider Officer Stryker to have falsely represented that Defendant delivered the dog food bag, as discussed in Paragraph 15, Defendant has not shown that Officer Stryker "knowingly and intentionally or with reckless disregard for the truth" included this false statement in the Affidavit. *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (quoting *Franks*, 438 U.S. at 171).

As stated above, to make a "substantial preliminary showing" that an officer's statements were made with "reckless disregard for the truth," *United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017), the defendant must show that the officer "entertained serious doubts as to the truth of his [or her] allegations." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019) (quoting *United States v. Cican*, 63 F. App'x 832, 836 (6th Cir. 2003)). While there are inaccuracies regarding whether Defendant delivered the dog food bag, as well as the proper telephone number for TT2 and the date of the conversation at issue between Defendant and Codefendant Alim Turner, Defendant has failed to establish how these inaccuracies demonstrate that the statements at issue in the Affidavit were deliberate falsehoods or made with reckless disregard for the truth. *See, e.g.*, *United States v. Hill*, No. CR 17-20185, 2017 WL 5667354, at

14

*3 (E.D. Mich. Nov. 27, 2017) ("While there are some inconsistencies between the FBI surveillance notes and the affidavit, Defendants have not shown how these minor differences, i.e., the omission of the word 'weighted' and the absence of a reference to the black bag in the trunk, demonstrate that the statements in paragraph 22 were deliberate falsehoods or made with reckless disregard for the truth.").

Ultimately, Defendant has failed to "make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Crawford*, 943 F.3d at 309 (quoting *Franks*, 438 U.S. at 171). Therefore, with respect to Defendant's cumulative arguments, the Court finds that Defendant has not met his heavy burden to establish the necessity of a *Franks* hearing.

## IV.    DEFENDANT'S MOTION TO SUPPRESS

### A.    Legal Standard

Under the Fourth Amendment, there must be probable cause for a search warrant to issue, and the warrant must be based on facts that demonstrate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When determining whether an affidavit establishes probable cause, the Court typically considers only the information that was before the issuing judge, i.e., only what is contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010); *see also Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).

15

Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). To determine probable cause, an issuing judge must examine the totality of the circumstances and find "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (internal quotation marks omitted). For a search warrant to issue, an affidavit must show a likelihood that (1) the items sought are seizable by virtue of being connected with criminal activity and (2) the items will be found in the place to be searched. *United States v. O'Connor*, 723 F. App'x 302, 307 (6th Cir. 2018) (internal citations omitted). A supporting affidavit must, therefore, sufficiently demonstrate the existence of a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)).

## B.    Probable Cause Finding

Defendant claims that the Affidavit failed to establish a nexus between 301 Lippencott and the items to be seized. Defendant asserts that the only facts connecting the residence are set forth in Paragraphs 5(a) and (n), which state Officer Stryker's experience that drug dealers usually keep controlled substances and paraphernalia, as well as historical documents and records, at their residences. Defendant maintains that "[n]owhere in the affidavit is there any allegation that drug transactions were taking place at the apartment, that multiple people frequently came and went . . . that [Defendant] was anywhere near his apartment when the alleged drug transaction phone calls were made, that [Defendant] has any criminal history of drug dealing, or even that [Defendant] had been observed first hand . . . in the possession of drugs." [Doc. 191 at 8–9].

16

Moreover, Defendant notes that the Affidavit states that the door to Defendant's apartment was difficult to observe using traditional surveillance, and law enforcement was unable to see exactly who came and went out of 301 Lippencott. *See* [Doc. 191-1 at ¶ 16].

The Government responds [Doc. 231] that the Affidavit described Officer Stryker's training and experience, including that, based on his training and experience, drug dealers usually keep controlled substances and paraphernalia, as well as records, at their residences. *See* [Doc. 191 at ¶ 5]. The Government contends that the Affidavit established that Defendant lived at 301 Lippencott from at least June 25 through September 4, 2019. [*Id.* at ¶ 16]. Further, the Government asserts that the Affidavit outlined specific intercepted wiretap calls in paragraphs 11–15 that "described Defendant Stewart's repeated and extensive drug trafficking in the summer of 2019 with his co-conspirators, oftentimes involving substantial quantities of methamphetamine." [Doc. 231 at 41].

The Government asserts that the principle that evidence is likely to be found where drug dealers live "holds true even when the affidavit contains no direct evidence of drug trafficking at the drug dealer's residence." [*Id.* (citing *United States v. Gunter*, 551 F.3d 472, 476–77 (6th Cir. 2009); *United States v. Kenny*, 505 F.3d 458, 461–62 (6th Cir. 2007); *United States v. Goward*, 188 F. App'x 355, 358–60 (6th Cir. 2006); and *United States v. Miggins*, 302 F.3d 384, 388 (6th Cir. 2002) (among other cases))]. Therefore, the Government claims that the Affidavit established Defendant as a significant drug trafficker engaged in ongoing trafficking, and thus established a nexus between his residence and the evidence sought related to drug trafficking.

In determining whether an affidavit establishes a nexus, the undersigned begins by observing that the issuing judge's determination that probable cause exists is entitled to "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Illinois v. Gates*,

462 U.S. 213, 236 (1983)). The "nexus [between the place to be searched and the evidence sought] may be established by the nature of the items and normal inferences of where a person would keep such items." *United States v. Hawkins*, 278 F. App'x 629, 634 (6th Cir. 2008). The Sixth Circuit has held that "an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking," *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008), but that "a defendant's status as a drug dealer, standing alone" will not "give[ ] rise to a fair probability that drugs will be found in his home." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005). "Therefore, to meet the probable cause standard, an affidavit must include some facts connecting the residence to drug-dealing activity beyond just the defendant's status as a drug dealer." *United States v. Jenkins*, 743 F. App'x 636, 642 (6th Cir.), *cert. denied*, 139 S. Ct. 611 (2018).

In *United States v. Brown*, the Sixth Circuit detailed that "as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." 828 F.3d 375, 382–84 (6th Cir. 2016). The Sixth Circuit explained that in order to infer that drugs could be located at the defendant's residence, his "status as a drug dealer" plus "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence" is required to find a sufficient nexus for probable cause purposes. *Id.* at 383. Specifically, the *Brown* Court explained that "we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id.*

18

The Government attempts to differentiate the Affidavit from the "inadequate" affidavit in *Brown* by claiming that the present "Affidavit established Defendant Stewart as a significant drug trafficker engaged in ongoing and extensive drug trafficking crimes — and the . . . [A]ffidavit established these facts not with uncorroborated tips about Defendant Stewart's supposed 'status as a drug dealer,' but with Defendant Stewart's own incriminating words and the words of his co-defendants on the wiretap." [Doc. 231 at 43]. The Government also attempts to differentiate the instant case from *United States v. Frazier*, where the affidavit was "based almost exclusively on the uncorroborated testimony of unproved confidential informants," 423 F.3d at 533, by pointing to the wiretap calls "as well as a seized package containing approximately five pounds of methamphetamine" [Doc. 321 at 43].

The Sixth Circuit in *Brown* recognized in a footnote that "in a few cases, we found the nexus sufficient even though the affidavit did not contain facts showing that the residence had been used in drug trafficking," but that "[t]hese cases are distinct from the typical drug trafficking case, however, because the affidavits did not just establish that the defendants were drug dealers, but contained overwhelming evidence that the defendants were major players in a large, ongoing drug trafficking operation." *Brown*, 828 F.3d at 384 n.2 (citing *United States v. Gunter*, 551 F.3d 472, 476–77 (6th Cir. 2009); *United States v. Kenny*, 505 F.3d 458, 461–62 (6th Cir. 2007); *United States v. Miggins*, 302 F.3d 384, 388 (6th Cir. 2002)).

Therefore, the Government's argument against suppression centers on whether the Affidavit "contained overwhelming evidence that [Defendant was a] major player[ ] in a large, ongoing drug trafficking operation." *Id.* The Sixth Circuit has acknowledged the "struggle[ ] to identify the quantum of evidence needed to connect drug trafficking by an individual to a probability that the evidence will be found at the individual's residence." *United States v. Ardd*,

911 F.3d 348, 351 (6th Cir.), *cert. denied*, 139 S. Ct. 1611 (2019). In one of the few decisions to address the contrast between the overall holding in *Brown* and the recognition of past precedent in the applicable footnote, the Eastern District of Kentucky recently reviewed that:

> Despite *Brown*'s call for proof beyond mere dealer "status," the panel acknowledged the reasoning of prior, published Circuit decisions finding that information indicating a suspect ranks as a "major player[ ] in a large, ongoing drug trafficking operation" can fill the inferential gap left by the absence of direct residence-nexus proof. 828 F.3d at 383 n.2 (collecting cases). This is consistent with *Brown*'s dealer-status-plus framework. A key participant in an expansive, continuing distribution scheme is not merely a run-of-the-mill dealer. It also fits neatly with the broader idea that a "magistrate may infer that the evidence sought is likely to be found in the criminal's residence based on the type of crime being investigated, the nature of the things to be seized and the normal inferences that may be drawn as to likely hiding places," and builds on the background concept that, absent contrary evidence, it is generally "reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there." *Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir.) (internal quotation marks and alterations omitted), *cert. denied*, —— U.S. —— –, (2018). "[W]hen drugs are used in the commission of a distribution offense, the distributed drugs are no longer in the possession of the suspected distributor." *Id.* at 273. Thus, the inference of residential storage (based on status alone) is far weaker for a small-scale trafficking conspirator, a minor participant in a larger scheme, or a party to a concluded conspiracy. By contrast, a major player in an ongoing, high-quantity operation is logically likely to maintain more illicit inventory than one or multiple discrete distributive acts would exhaust. Again, commonsense and totality are watchwords in judging probable cause.

*United States v. Nantz*, 466 F. Supp. 3d 733, 738–39 (E.D. Ky. 2020).

In *Nantz*, the Eastern District of Kentucky first found that the affidavit at issue "provided ample grounds to believe that [the Defendant] was [the] co-leader or partner in a multi-pound, continuing, and immediately active meth trafficking conspiracy," as well as that it was unchallenged that the defendant "lived at the subject residence." *Id.* at 739. However, the Eastern District of Kentucky noted that the affidavit "provided other good reasons, beyond [the defendant's] leading role and the conspiracy's scale, to believe officers would find meth, specifically, at the searched residence," pointing to the volume of methamphetamine involved in

the conspiracy, "the numerosity of their sources, the frequency with which [they] resupplied their meth stock, and their persistence in securing new suppliers . . . when others were lost strongly indicate[s] that [the defendant] would, at any given time, be in possession of meth." *Id.* at 740. The Eastern District of Kentucky lastly found that "critically, the warrant's validity [did] not hinge on the affidavit providing probable cause to believe that <u>drugs</u> would be found in [the defendant's] home" as the "affidavit provided significant grounds to believe" computers and cell phones containing trafficking evidence would be found at the defendant's home. *Id.* at 741–42 (emphasis in the original).

Ultimately, the Court finds that the Affidavit in the present case contains "overwhelming evidence" that Defendant was a "major player[ ] in a large, ongoing drug trafficking operation." *United States v. Brown*, 828 F.3d 375, 384 n.2 (6th Cir. 2016). The Affidavit supports that Defendant was "not merely a run-of-the-mill dealer;" rather, he was "[a] key participant in an expansive, continuing distribution scheme." *Nantz*, 466 F. Supp. 3d at 738. First, the Affidavit alleges that law enforcement believed that Defendant worked with Codefendant Alim Turner, the suspected leader of the Knoxville "set" of the Unknown Vice Lords, to distribute methamphetamine. [Doc. 191-1 at ¶ 7]. Intercepts of Codefendant Alim Turner's telephone communications demonstrate that he regularly discussed the purchasing and reselling of illegal narcotics with Defendant. [*Id.* at ¶ 9]. Paragraph 11 of the Affidavit details an intercepted call in which Defendant tells Codefendant Alim Turner that he is attempting to raise money and utilizes a slang term for selling and distributing illegal narcotics. [*Id.* at ¶ 11]. Moreover, an additional intercepted call reveals Defendant and Codefendant Alim Turner negotiating the price for two ounces of methamphetamine that Codefendant Alim Turner wants to purchase from Defendant in order to sell to a customer. [*Id.* at ¶ 12].

21

As detailed above, Paragraph 13 describes intercepted conversations between Defendant and Codefendant Alim Turner in which they discuss the shipment of approximately five pounds of methamphetamine. [*Id.* at ¶ 13]. An additional intercepted conversation, set forth in Paragraph 14, after Codefendant Alim Turner was arrested, details Defendant's conversation with Codefendant Gilmore and their plan to purchase crystal methamphetamine from their source of supply in Nashville, as well as that they needed to pay the "plug" $16,000, and had $11,000 in a safe. [*Id.* at ¶ 14]. Lastly, regardless of whether Defendant transferred the bag of dog food previously discussed, Paragraph 15 of the Affidavit sets forth Defendant's repeated conversations with Codefendant Gilmore about collecting debts to obtain money to pay the source of supply and coordinating the time and location to meet with Codefendants Forbes and Gilmore, who were later found with approximately $13,130. [*Id.* at ¶ 15].

The summaries of these intercepted conversations in the Affidavit detail Defendant's role as a "key participant" in both the procurement and distribution of large quantities of methamphetamine. *See United States v. Nantz*, 466 F. Supp. 3d 733, 738 (E.D. Ky. 2020). Defendant was in frequent communication with Codefendant Alim Turner, the alleged leader of the significant drug trafficking operation, about methamphetamine distribution. Defendant was also involved in coordinating the actions of the drug conspiracy with Codefendant Alim Turner and other co-conspirators. Significantly, after Codefendant Alim Turner's arrest, Defendant coordinated with other co-conspirators to procure a large quantity of funds required to obtain methamphetamine from the source of supply in Nashville. This enhanced level of participation thus "fill[s] the inferential gap left by the absence of direct residence-nexus proof." *Id.*

Additionally, similar to *Nantz*, it is undisputed that Defendant lived at 301 Lippencott during the time period at issue, and "[n]othing in the affidavit suggests a concluded scheme or an

22

operation on its last legs." *Id.* at 739. "Evidence of a defendant's ongoing course of unlawful conduct may make it reasonable to conclude that he keeps evidence of his illegal scheme in his home." *United States v. McCoy*, 905 F.3d 409, 417 (6th Cir. 2018). In fact, Defendant took on an increased role in the conspiracy after Codefendant Alim Turner's arrest. "When a warrant application presents reliable evidence that a drug-trafficking operation is ongoing, 'the lack of a direct known link between the criminal activity and [dealer's] residence, becomes minimal.'" *Id.* (quoting *United States v. Newton*, 389 F.3d 631, 635–36 (6th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005)).

Moreover, as required, the Affidavit set forth the type of trafficking evidence expected to be found. Here, the Affidavit included cellular telephones and financial records as things to be seized, with Officer Stryker stating that drug traffickers often maintain records relating to the acquisition and disposition of drug proceeds and use telephones to facilitate their drug activities. [Doc. 191-1 at ¶ 5]. "[T]he affidavit must suggest that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought and not merely that the owner of property is suspected of crime." *Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir.) (quoting *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006)), *cert. denied*, 139 S. Ct. 108 (2018). Critically, the Affidavit "provided significant grounds to believe such evidence would be found" at 301 Lippencott. *See Nantz*, 466 F. Supp. 3d at 741; *see, e.g.*, *Peffer*, 880 F.3d at 270 ("The requirement that there be additional reason to think that evidence of the crime will be found in the criminal's residence is not as onerous as it may appear."). As detailed above, the Affidavit reviews the intercepted conversations involving Defendant and various codefendants discussing drug-trafficking related activities on their telephones, such as

discussing obtaining the necessary amount of cash to pay the source of supply for the methamphetamine.

In *Peffer*, the Sixth Circuit differentiated guns and computers from drugs, as "[u]nlike drugs, guns and computers are objects that generally remain in the suspect's possession after commission of the crime, and therefore it is reasonable to believe those possessions to be stored at the suspect's residence, absent evidence to the contrary." *Id.* at 273. "The same logic rationally applies to a cellphone used in the commission of crime" and the Affidavit "certainly presents nothing suggesting that [Defendant and the respective co-conspirators] were in the habit of discarding their cellphones or deleting incriminating messages." *See Nantz*, 466 F. Supp. 3d at 741. Therefore, the Affidavit also provides probable cause to believe that further evidence of drug trafficking, including Defendant's phone, would be found at his residence.

Accordingly, for the reasons set forth above, the Court finds that the Affidavit is sufficient to support a finding of probable cause and establishes a sufficient nexus between the place to be searched and the evidence sought.

### C. Good Faith

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). However, if the evidence was "obtained in objectively reasonable reliance" on the "subsequently invalidated search warrant," then it should not be suppressed. *United States v. Leon*, 468 U.S. 897, 922, (1984). "[T]he decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred." *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010).

There is "an exception to the exclusionary rule where 'the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid.'" *United States v. Watson*, 498 F.3d 429, 431 (6th Cir. 2007) (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 987–88 (1984)). The good-faith exception will not apply where "the affidavit is 'so lacking in [indicia of] probable cause as to render official belief in its existence entirely unreasonable'" or "where the officer's reliance on the warrant was neither in good faith nor objectively reasonable." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (quoting *Leon*, 468 U.S. at 923).

Ultimately, because the Court has found that the Affidavit provides probable cause, it will not "exhaustively analyze the application of the good faith exception or the propriety of suppression as a remedy." *See, e.g.*, *United States v. Barron*, No. 5:17-CR-101-DCR-REW, 2017 WL 5165963, at \*10 (E.D. Ky. Oct. 12, 2017), *report and recommendation adopted by*, 2017 WL 5160687 (E.D. Ky. Nov. 7, 2017). However, "[h]ad we concluded otherwise and found probable cause to be lacking, the Court determines that the *Leon* good-faith exception to the exclusionary rule nevertheless would apply." *United States v. Black*, No. 1:17-CR-00074(2), 2018 WL 1660751, at \*8 (S.D. Ohio Jan. 17, 2018).

In *United State v. McCoy*, the Sixth Circuit addressed the application of the *Leon* good-faith exception in an analogous review of a search warrant. 905 F.3d 409 (6th Cir. 2018). "For an officer's reliance on a warrant to have been reasonable, the application must have provided 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" *Id.* at 416 (quoting *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016) (additional internal quotations omitted)); *see, e.g.*, *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc). "The affidavit need not establish a 'substantial basis,' only 'some connection, regardless of how remote

it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched.'" *McCoy*, 905 F.3d at 416 (quoting *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) (citation and internal quotation marks omitted)); *see also United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) (explaining that good-faith reliance on an affidavit requires a "less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause") (quoting *Carpenter*, 360 F.3d at 595).

"[W]hen a drug dealer is engaging in continual and ongoing operations, drug contraband is likely to be found in the drug dealer's home." *McCoy*, 905 F.3d at 421. The Sixth Circuit has "said that a minimally sufficient nexus exists if the reviewing court is able to identify in the averring officer's affidavit some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *United States v. Tucker*, 742 F. App'x 994, 999 (6th Cir. 2018) (quotation marks and alterations omitted).

Therefore, for the reasons supporting the earlier probable cause determination, the Court also finds that the Affidavit was not so lacking in indicia of probable cause so as to render the belief in its existence entirely unreasonable. *See, e.g.*, *United States v. Barron*, No. 5:17-CR-101-DCR-REW, 2017 WL 5165963, at *10 (E.D. Ky. Oct. 12, 2017) ("This affidavit, in the Court's evaluation, obviously 'contain[s] a minimally sufficient nexus between the illegal activity and the place to be searched,' even if it hypothetically failed to cross the probable cause nexus threshold, justifying application of the good faith exception.") (quoting *Brown*, 828 F.3d at 385), *report and recommendation adopted by*, 2017 WL 5160687 (E.D. Ky. Nov. 7, 2017).

26

## V.     CONCLUSION

Accordingly, the undersigned respectfully **RECOMMENDS**[3] that that Defendant's

Motion to Suppress and for a *Franks* Hearing [Doc. 191] be **DENIED**.

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

27